UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-20590 |
| Plaintiff, | F. Kay Behm |
| v. | United States District Judge |
| BOBBY BOSEMAN, | |
| Defendant. | |
| _____ / | |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (ECF No. 40)**

**I.    INTRODUCTION**

This matter is before the Court on Defendant Bobby Boseman's motion to suppress. (ECF No. 40). On January 5, 2022, Defendant was charged in a Second Superseding Indictment with two counts of sex trafficking and attempted sex trafficking by force, fraud, and coercion pursuant to 18 U.S.C. §§ 1591(a)(1), (b)(1), and § 1594; three counts of being a felon in possession of a firearm and ammunition pursuant to 18 U.S.C. § 922(g)(1); one count of possession with intent to distribute cocaine pursuant to 21 U.S.C. § 841(a)(1); one count of possession of a firearm in furtherance of a drug trafficking crime pursuant to 18 U.S.C. § 924(c)(1)(a); and one count of maintaining a drug premises pursuant to

1

21 U.S.C. § 856(a)(1).  (ECF No. 22).  This case was initially before District Judge Shalina D. Kumar but was reassigned to the undersigned on February 2, 2023.

On December 10, 2022, Defendant filed the present motion to suppress evidence and request for an evidentiary hearing.  (ECF No. 40).  Defendant's motion asks the court to "suppress all evidence obtained from the unlawful searches of Defendant's premises" based on violations of his Fourth Amendment rights.  (ECF No. 40, PageID.126).  The court granted Defendant's request for an evidentiary hearing, which was held on May 9, 2023.  (*See* ECF No. 55).  The parties were given additional time to submit supplemental briefing on the issues raised at the evidentiary hearing, and the matter is now fully briefed.  (*See* ECF Nos. 59, 61).  Considering the parties' arguments and the evidence presented, the court now **DENIES** Defendant's motion to suppress.

## II.   FACTUAL BACKGROUND

The key facts of this case stem from three separate searches of Defendant's residence located at 1915 Tebo Street in Flint, Michigan (the "Tebo house").[1]  (ECF No. 40, PageID.128).  The relevant facts of each search are as follows:

---

[1] "[Defendant] continuously resided at 1915 Tebo St. in Flint, Michigan, between February 2021 and August 2021."  (ECF No. 40, PageID.129).

A.  The February 26, 2021 Search

On or around February 26, 2021, Flint Police Department (FPD) officers received numerous tips and complaints about drug trafficking activity at the Tebo house. (ECF No. 44, PageID.213). FPD officers conducted surveillance "in and around the location over the course of 24-48 hours," and observed activity consistent with drug trafficking. *Id.* As a result, the FPD officers applied for a search warrant, which was authorized on February 25, 2021, and was executed the following day. *Id.*, PageID.213-14; *see also* ECF No. 40-3, Search Warrant. In their search, the officers allegedly found drugs, digital scales, firearms, ammunition, and other evidence. *Id.*, PageID.214.

B.  The March 16, 2021 Search

On or around March 11, 2021, police officers with the Flint Area Narcotics Group (FANG) conducted surveillance of the Tebo house after receiving an anonymous tip regarding drug activity. *Id.*, PageID.214. During their surveillance, the officers allegedly observed "activity indicative of drug trafficking, including multiple 'short stays' by both vehicular and foot traffic." *Id*. The officers also conducted a trash pull from the house and found numerous plastic baggies containing a white powder that later field-tested positive for cocaine. *Id*. As a result, the officers applied for a search warrant, which was granted by Judge

Jennifer Manley on March 13, 2021, and was executed on March 16, 2021. *Id.*; *see also* ECF No. 40-4, Search Warrant. In their search of the house, the officers allegedly found drugs, a digital scale, firearms, ammunition, and other evidence. *Id.*

### C. The August 3, 2021 911 Call and Search

The charges brought in this case stem from a 911 call and subsequent search of the Tebo house on August 3, 2021. (*See* ECF No. 1). Around 2:50pm on August 3, an individual called 911 and reported that her cousin ("Adult Victim 1" or "AV-1") and another woman ("Adult Victim 2," or "AV-2")[2] had been missing for two days and were tied up and being held against their will at the Tebo house by a man who goes by the name "Killer B." (ECF No. 44, PageID.210; *see also* Exhibit 2A, 911 Call Audio). The caller provided a physical description of "Killer B" and both victims. *Id*. The caller also reported that the Tebo house was a drug house, and there were weapons and people using drugs inside. (ECF No. 58, PageID.296 ("the caller stated that they're all using crack in the home and there are lots of weapons")). The caller asked the police to conduct a welfare check and

---

[2] The caller referenced both victims by name in the 911 call, but their names have been withheld for their privacy. (ECF No. 58, PageID.287) ("Just to let your Honor know, we are going to collectively try to avoid referring to the victims by their names during this hearing…").

4

"get the victims out of the home," and stated that she was waiting down the street from the house for the police to arrive. *Id*.

Shortly after the 911 call, FPD Officers Vincent Villareal and Albert Essix were dispatched to the Tebo house. *Id.*, PageID.290, 341.  Officer Villareal testified that he was contacted on his way to the residence by Sergeant Scott Watson, head of the Special Operations Bureau, who reportedly told him to "take this seriously." *Id.*, PageID.342-43.  Officer Essix testified that Officer Villareal "told [him] that he had received a phone call from Sergeant Scott Watson, and Scott Watson told him over the phone that he had prior dealings with this address and that any calls that came out concerning or regarding that address was [sic] credible." *Id.*, PageID.299.

When the officers arrived at the Tebo house, they were informed by dispatch that the caller was no longer in the area, but she still wanted them to conduct a welfare check. *Id.*, PageID.298.  Officer Villareal first approached the front door of the house and knocked and announced that he was Flint Police. *Id.*, PageID.348.  He testified that a male individual came to the interior door and asked Officer Villareal what he was doing. *Id*.  Officer Villareal claimed that his view of this individual was blocked by a storm door that was covered by a mirrored window tint, but he could tell that the individual was wearing a white

5

shirt. *Id*. ("Q: Were you able to see anything about the person who was at the door? A: That they had a white shirt on, other than that, no."). Officer Villareal then asked the individual something along the lines of "You know, I'm here to check on two females…are they here? Can I come in?" *Id*. He received no response. *Id*.

While Officer Villareal was at the front door, Officer Essix stayed halfway between the porch and the sidewalk. *Id.*, PageID.325. He then observed a woman walk out from behind the north side of the house. *Id*. Officer Essix approached her and asked if she was one of the two individuals they were looking for (AV-1 or AV-2). *Id*. She responded that she was not, and said she was just there looking for her cheating boyfriend. *Id.*, PageID.303. Shortly after, another woman appeared from the same general area on the north side of the house. *Id*. Officer Essix testified that he also approached her and asked if she was AV-1 or AV-2. *Id*. She responded that she was not and claimed she had just jumped over the fence and was cutting through the yard. *Id*. Both individuals left the scene after talking with Officer Essix. *Id*.

Officer Essix then informed Officer Villareal he would be going around to the back of the house. *Id*. As he was walking toward the backyard, Officer Essix testified that he saw "a silhouette of a person standing on the other side of [the

wooden fence], and when they saw [Officer Essix], they took off running." *Id.*, PageID.305.  Around the same time, Officer Essix heard grass rustling and saw "a second subject running east from the fence line." *Id*.  Officer Essix then observed another woman exit the back door of the house. *Id*.  He testified that he asked her if she was AV-1 or AV-2, and she "gave [] a nonverbal cue by shaking her head side to side, no, and she didn't say anything else" and kept walking. *Id.*, PageID.306.

     Officer Villareal then joined Officer Essix at the back of the house, and they both observed that the back door had been left wide open. *Id.*, PageID.309, 350.  The officers then re-announced their presence as "City of Flint Police Department" and, after hearing no response, entered the house through the open back door. *Id.*, PageID.308.  The officers walked down the main hallway and entered the first bedroom, where they located one of the victims lying on the couch. *Id.*, PageID.310.  Officer Essix then went down the hall to another bedroom (the "northeast bedroom") where he observed the other female victim "lying on her belly, face down." *Id.*, PageID.311.  Officer Essix testified that the second victim was completely nude and had significant bruising on her face. *Id*.  Officer Essix testified that she told him they had been held there for two days, were forced to perform sexual acts, and had been beaten daily by customers and

"Killer B." *Id.*, PageID.313.  Officer Essix notified dispatch that they had located the two victims and called for EMS and a supervisor. *Id.*, PageID.312.  The officers then conducted a limited protective sweep, but did not otherwise search the house.  (ECF No. 44, PageID.213).

Following these events, the FBI sought a federal search warrant for the house, which was authorized by U.S. Magistrate Judge Stafford on August 3, 2021. *Id.*; *see also* ECF No. 40-1, Search Warrant.  The search conducted pursuant to the authorized search warrant uncovered "a black dildo; a machete in a sheath, with blood near the machete; used condoms; cash currency; a firearm; ammunition; holsters; magazines; baggies of suspected crack cocaine; and drug paraphernalia." (ECF No. 1, PageID.6).  Law enforcement also found Defendant hiding in the basement of the house with more than $700 cash in his pocket. *Id.*, PageID.7.

### III. ANALYSIS

The key question currently before the court is whether all evidence gathered during the three searches of the Tebo house should be suppressed under the exclusionary rule and the "fruit of the poisonous tree" doctrine.  The Fourth Amendment provides, in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend IV.  The

exclusionary rule prohibits evidence obtained in violation of the Fourth Amendment from being used in a criminal proceeding against the victim of an illegal search or seizure. *Herring v. United States*, 555 U.S. 135, 140 (2009). To trigger the exclusionary rule, a challenged action must be "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Buford,* 632 F.3d 264, 271 (6th Cir. 2011) (citing *Herring*, 555 U.S. at 145). The exclusionary rule is supplemented by the "fruit of the poisonous tree" doctrine, which bars the admission of any evidence derived from an unconstitutional search or seizure. *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008).

    A.    <u>The February 26, 2021 and the March 16, 2021 Searches</u>

Defendant first argues that both the search warrant executed on February 26, 2021 and the search warrant executed on March 16, 2021 were invalid because they lacked probable cause to search the Tebo house. (ECF No. 40, PageID.140). For a search warrant to be valid, it must be supported by probable cause. U.S. Const. amend IV. Probable cause is defined as "reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016). In determining whether to issue a warrant, a judge must decide, "given all the

9

circumstances set forth in the affidavit...there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (citing *Illinois v. Gates*, 472 U.S. 213, 238-39 (1983)). A reviewing court must accord "great deference" to an issuing judge's determination, and their discretion "should only be reversed if it was arbitrarily exercised." *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000).

In this case, the February 26, 2021 search warrant was based on: "numerous tips/concerns that drug trafficking was being conducted at 1915 Tebo Street in the City of Flint;" surveillance conducted over a period of 24-48 hours in which officers observed "traffic indicative of drug trafficking;" traffic stops on numerous vehicles after their occupants were observed entering and exiting the Tebo house within a short time frame, resulting in the discovery of narcotics allegedly purchased from the house; evidence of a woman who was a resident of the Tebo house being killed in a drive-by shooting on April 13, 2020; and evidence of five victims of another drive-by shooting in which the Tebo house was the intended target on January 29, 2021. (ECF No. 40-3, PageID.192-93). The March 13, 2021, search warrant was based on: "an anonymous tip that there was drug activity at the Tebo house;" a trash pull where officers discovered "numerous clear plastic baggies containing a white powder" that later field tested positive for

10

cocaine; and five hours of surveillance over a two-day period at the Tebo house where officers observed multiple "short stays" by both vehicles and foot traffic. (ECF No. 40-4, PageID.200). Considering the content of the affidavits in support of each search warrant and affording the proper level of deference to the issuing judge, the court finds the included information was sufficient to establish "probable cause to believe contraband or evidence," specifically evidence of drug trafficking, was located at the Tebo house. *Allen*, 211 F.3d at 973.

Further, even if there was not actually probable cause to issue either warrant, the searches were justified under the "good-faith exception" to the exclusionary rule. "Under the good-faith exception, '[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted in objectively reasonable reliance on the subsequently invalidated search warrant.'" *United States v. Powell*, 603 F. App'x 475, 477 (6th Cir. 2015) (citing *Herring*, 555 U.S. at 142). There are four general scenarios in which officers' reliance on a subsequently invalidated search warrant is objectively unreasonable:

> (1) where "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";
> (2) "where the issuing magistrate wholly abandoned his [neutral and detached] judicial role";

11

> (3) where the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and
> (4) where the warrant is so "facially deficient…that the executing officers cannot reasonably presume it to be valid."

*Id.* (citing *United States v. Leon*, 468 U.S. 897, 923 (1984)). Defendant argues that each of these search warrants were "based on affidavits so lacking in indicia of probable cause as to render official belief in their existence entirely unreasonable." (ECF No. 40, PageID.148). However, as discussed above, the affidavits each contained a list of information creating at least a "minimally sufficient nexus between the illegal activity and the place to be searched." *Powell*, 603 F. App'x at 477 (citing *Carpenter*, 360 F.3d at 595 ("the good-faith standard is 'less demanding' than the 'threshold required to prove the existence of probable cause.'")). For these reasons, the exclusionary rule does not apply, and the evidence uncovered during the February 26, 2021 and March 16, 2021 searches will not be suppressed.

    B.    <u>The August 3, 2021 Search</u>

Defendant next argues that, because the federal search warrant obtained for his residence on August 3, 2021 was based almost entirely on the statements of the two victims and the information gathered by officers during their initial visit, all evidence seized from the Tebo house must be suppressed as the "fruit of

the officers' unlawful entry into [his] home." (ECF No. 40, PageID.145). It is undisputed that the officers did not have a warrant when they first entered the Tebo house. (*See* ECF No. 44, PageID.209 ("officers' initial <u>warrantless</u> entry into his residence in August 2021…") (emphasis added)). It has often been said that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585-86 (1980) (citing *United States v. United States District Court*, 407 U.S. 297, 313 (1972)). As such, warrantless searches of an individual's residence are per se unreasonable, subject to only a few "specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citations omitted). "Exigent circumstances" are one such exception. *Johnson v. City of Memphis*, 617 F.3d 864, 868 (6th Cir. 2010) (citing *Mincey v. Arizona*, 437 U.S. 385, 390 (1978) ("[W]arrants are generally required to search a person's home or his person unless the 'exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.")).

Within exigent circumstances, the emergency aid exception allows law enforcement officers to enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.

13

*Michigan v. Fisher*, 558 U.S. 45, 47 (2009).  The emergency aid exception does not require "ironclad proof of a serious, life-threatening injury," and officers are not required to "wait for a potentially dangerous situation to escalate into public violence in order to intervene."  *Johnson*, 617 F.3d at 868 (citing *Fisher*, 558 U.S. at 46).  However, there must be evidence showing the officers had an "objectively reasonable belief, given the information available at the time of entry, that a person within the house was 'in need of immediate aid'" to justify the warrantless entry.  *Id.* (citations omitted); *see also Brigham City, Utah v. Stuart*, 547 U.S. 398, 406 (2006).

      To determine whether there were sufficient exigent circumstances to excuse the officers' warrantless entry into the Tebo house, the court must consider what specific information was available to the officers at the time of entry.  The key pieces of information given to Officer Villareal and Officer Essix came from the 911 call in which the caller stated that she "wanted [law enforcement] to go to…1915 Tebo, to check the welfare of her cousin and another female…"  (Exhibit 2A; *see also* ECF No. 58, PageID.295).  The 911 caller identified herself and stated that she was a relative of AV-1, identified the alleged perpetrator as an individual who goes by the name "Killer B," provided a detailed physical description of "Killer B", and stated that she had tracked AV-1's phone to

14

the Tebo house. *Id*. Her call also stated that it was a drug house and "there are lots of weapons" inside. (ECF No. 58, PageID.296). The Sixth Circuit has previously emphasized the important role of 911 calls in determining whether the emergency aid exception applies, stating "[t]he whole point of the 911 system is to provide people in need of emergency assistance an expeditious way to request it." *Johnson*, 617 F.3d at 870 (citations omitted). "Because a 911 call is by its nature an appeal for help in an emergency, the emergency aid exception best fits the attitude of police responding to a 911 call…" *Id.*

In addition to the information presented through the 911 call, the officers also observed several individuals acting in a suspicious manner around the house after Officer Villareal knocked on the front door. Officer Essix testified that he separately interacted with three women who appeared from the back of the house and either denied being one of the victims or refused to interact. (ECF No. 58, PageID.303, 306). Officer Essix also testified that he observed two men appearing to run away from the Tebo house beyond the fence line. *Id.*, PageID.305. Officer Essix stated, in his opinion, he "felt that they were distancing themselves from the house. I feared there was something that they didn't want us to find…" *Id.*, PageID.307. Officer Villareal also received a phone call from Sergeant Scott Watson while he was driving to the Tebo house who cautioned

that "he had prior dealings with this address and any calls that came out concerning or regarding that address was [sic] credible." *Id.*, PageID.300; *see also* PageID.343 ("he had overheard the call go out over radio and said, 'Hey, take this' – basically take this seriously, you know, this is probably going on.").

Defendant specifically questions the reliability of the 911 caller and argues that, because the officers heard "no shouts for help, sounds of fighting or assault coming from inside the house," they had no reason to "believe that exigent circumstances existed for the officers to enter the house without a search warrant." (ECF No. 59, PageID.382). Defendant also argues this case is analogous to the facts of *Williams v. Mauer*, 9. F.4th 416 (6th Cir. 2021), in which the Sixth Circuit held that the emergency aid exception did not justify law enforcement's warrantless entry. (ECF No. 40, PageID.137). In *Williams*, law enforcement officers responded to an anonymous 911 caller who reported that "someone had just busted into [her] neighbors…" *Id.* at 423. The anonymous caller stated that she "heard him down there screaming" and "heard him break the glass" and told dispatch that the alleged disturbance was occurring in Apartment 103. *Id.* When the officers arrived at the apartment complex they did hear screaming, but they "could not identify where the screaming was coming from" and did not notice any

16

sign of forced entry into Apartment 103. *Id.* Law enforcement officers eventually entered Apartment 103 and got into an altercation with its residents. *Id.*

While it is true that both the present case and *Williams* involved officers who received a 911 call but did not observe any outward signs of struggle when they arrived, the call in *Williams* differs significantly from the detailed call in this case. First, the 911 caller in *Williams* remained completely anonymous and provided no information that would substantially corroborate her allegations. *Id.* Additionally, she placed another 911 call shortly after the first in which she "retracted her identification of Apartment 103 as the site of the alleged disturbance" and told the operator that "she was no longer 'positive what apartment it was coming from.'" *Id.* When the officers arrived, they only observed broken glass on the outer pane of the window to Apartment 103, but the inner pane was still intact. *Id.* at 434. The court found that this "neither corroborated the identification of Apartment 103, nor provided an objectively reasonable basis to believe that someone within the apartment was seriously injured or threatened with serious injury." *Id.*

Unlike in *Williams,* the officers in this case did have an objectively reasonable basis to believe that the victims were inside the Tebo house and were in need of immediate aid. *Fisher*, 558 U.S. at 47. The 911 caller provided her

name, the names and ages of the alleged victims, and the name and a physical description of the alleged perpetrator, as well as claimed that she had tracked one of the victim's phones to the Tebo house. (Exhibit 2A). When the officers arrived, there were numerous individuals acting suspiciously who appeared to "distance[] themselves" from the residence. (ECF No. 58, PageID.307). Finally, the officers received a warning from Sergeant Watson to "take this seriously" given his previous interactions with the house. *Id.*, PageID.299. Additionally, it is not a requirement for the police to observe evidence of a struggle or injury prior to entering a house to render emergency aid and, in fact, such a requirement "would conflict with the express statement in *Brigham City* that police officers do not need to wait for violence to happen before acting, as their duties also include the prevention of violence." (ECF No. 44, PageID.219 (citing *Brigham City, Utah*, 547 U.S. at 406)).

    Considering the totality of the circumstances and all of the information known to the officers at the time they entered Defendant's residence, their warrantless entry was valid under the emergency aid exception to the Fourth Amendment. As such, the subsequent search warrant based on the statements of AV-1 and AV-2 was valid, and the relevant evidence uncovered in that search will not be suppressed.

## IV. CONCLUSION

For the reasons stated above, the court finds that all three searches of Defendant's residence were lawful.  As such, the exclusionary rule does not apply and Defendant's Motion to Suppress is **DENIED.**

    **SO ORDERED.**

Date: September 6, 2023                          <u>s/ F. Kay Behm</u>
                                                      F. Kay Behm
                                                      United States District Judge