UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 21-cr-20590 |
| Plaintiff, | Hon. F. Kay Behm |
| v. | United States District Judge |
| BOBBY BOSEMAN, | |
| Defendant. | |
| _____ / | |

**OPINION AND ORDER RESOLVING OBJECTIONS TO DEFENDANT'S PRESENTENCE REPORT ON SENTENCING <u>GUIDELINES</u>**

This matter is before the court on the Government's objections to Defendant Bobby Boseman's Presentence Report (ECF No. 123), specifically as to Boseman's sentencing guidelines based on drug weight. The court held an evidentiary hearing on September 25, 2025, at which a witness ("Witness-1") testified and counsel for both parties were present. *See* ECF No. 135 (transcript of hearing). Counsel submitted supplemental briefing following the hearing for the court's consideration. ECF Nos. 138, 139, 143.

For the reasons explained below, the court sustains the objections in part and overrules them in part, calculates a combined amount of

1

1,849.68 kg of CDW arising from Boseman's drug sales or sales attributable to him as relevant conduct, corresponding to a base offense level of 30.  Boseman's final offense level is 35, resulting in guidelines of 235-293 months.

I.  **FACTUAL BACKGROUND**

In February 2025, Boseman pleaded guilty to possession with intent to distribute cocaine and maintaining a drug premises.  As part of that plea, he admitted to using, maintaining, and controlling his residence on Tebo Street as a drug premises for more than five months, between on or about February 26, 2021, and August 3, 2021.  ECF No. 114, PageID.630.  He also admitted to directing and leading others to use his residence as a drug premises.  *Id.*  He further admitted that he maintained his residence as a place where drugs containing cocaine were sold and used.  *Id.*, PageID.629-630.  He also specifically acknowledged that on February 26, he knowingly and intentionally possessed with intent to distribute 7.8 grams of a substance containing cocaine, as well as two firearms and 145 rounds of ammunition, all in furtherance of his possession with intent to distribute drugs.  *Id.*

The PSR contains further details of Boseman's drug dealing activity. None of these facts were disputed by Boseman, nor does he do so in his supplemental briefing. On February 24, 2021, law enforcement conducted surveillance on Boseman's residence and observed multiple individuals enter and then exit the house within two minutes or less, conducted traffic stops on vehicles leaving the residence and spoke to individuals who reported purchasing drugs at the residence. ECF No. 124, PageID.749. During a search of the residence executed on February 26, law enforcement found Boseman, firearms, ammunition, 7.7 grams of powder cocaine, 0.12 grams of cocaine base, four digital scales, $602.54 in cash on Boseman, and $1,130 in a safe in the residence. *Id.* at PageID.750. In March 2021, law enforcement received multiple tips of drug activity at the residence. *Id.*, PageID.750. They conducted a trash pull and obtained a plastic baggie with white powder that tested positive for cocaine. ECF No. 44, PageID.214. They again searched the residence and located Boseman, firearms and ammunition, a digital scale, and 0.95 grams of cocaine base. *Id.*; ECF No. 124, PageID.750. Finally, on August 3, 2021, law enforcement responded to the home following a report that two women were tied up,

naked, beaten and held against their will at the residence. *Id.* As established at the prior suppression hearing in this matter, a 911 caller also informed police of drug activity and weapons at the house. ECF No. 58, PageID.296. When officers responded to the home, multiple people fled or left the house. ECF No. 124, PageID.750. Inside, officers located Adult Victim-1 (AV-1) in a bedroom, with two black eyes, swelling on her face, a collapsed lung, and pain in her ribs and legs. *Id.* Officers also found Adult Victim-2 (AV-2) naked on the floor with her face swollen and her eyes nearly swollen shut, and barely able to move her mouth. *Id.* at PageID.751. Law enforcement also searched the residence and found Boseman in the basement with $741 in cash on his person, 26.92 grams of powder cocaine, 8.2 grams of cocaine base, methamphetamine tablets, firearms and ammunition, and sex paraphernalia. *Id.*

At the September 25, 2025 hearing, Witness-1 testified about the drug dealing run by Boseman at his residence on Tebo Street, including the quantities of drugs being distributed from Boseman's residence and Boseman's knowledge and control over that drug distribution. ECF No. 135.

## II.     STANDARD OF REVIEW

The drug quantity attributed to a defendant for sentencing guideline purposes is determined by the Court under a preponderance-of-the-evidence standard. *E.g.*, *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010).

A defendant's base offense level for drug-related offenses includes drug amounts that are part of the relevant conduct for the offense. *See* U.S.S.G. § 2D1.1 cmt.5; *id.*, § 1B1.3(a); *id.*, § 3D1.2(d). A court must "consider quantities not specified in the counts of conviction that are 'part of the same course of conduct or common scheme or plan.'" *United States v. Burke*, 243 Fed. App'x 69, 72 (6th Cir. 2007) (citing U.S.S.G. § 1B1.3(a)(2)). Relevant conduct also includes:

> (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were –
>
>> (i) within the scope of the jointly undertaken criminal activity,
>>
>> (ii) in furtherance of that criminal activity, and

> (iii) reasonably foreseeable in connection with that criminal activity; that occurred during the commission of the offense of conviction. . . .

U.S.S.G. § 1B1.3(a)(1).

The guidelines provide for an estimation of total drug amounts "[w]here there is no drug seizure or where the amount seized does not reflect the scale of the offense." U.S.S.G. § 2D1.1 cmt.5 (emphasis added). The guidelines thus explicitly contemplate and allow for a defendant to be held responsible for drug quantities based on the defendant's full relevant conduct, even in cases when no drugs have been seized at all.

"When the amount is uncertain, the court must approximate the quantity of drugs for which the defendant is more likely than not responsible." *Burke*, 243 Fed. App'x at 72 (citing *United States v. Jennings*, 83 F.3d 145, 149 (6th Cir. 1996)). "[T]he district court can make a reasonable estimate [of drug quantity] based on physical evidence *or* testimony." *Id.* (internal quotation and editing marks removed; emphasis added); *see also United States v. West*, 948 F.2d 1042, 1045 (6th Cir. 1991). When relying on circumstantial evidence, the court should "err on the side of caution in making its estimate."

6

*United States v. Murillo-Almarez*, 602 Fed. App'x 307, 311 (6th Cir. 2015); *United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004). However, a district court's determination of estimated drug amounts will be sufficient if it is supported by evidence that has "some minimum indicium of reliability." *Burke,* 243 Fed. App'x at 73. A district court's drug-quantity determination will be upheld unless it is clearly erroneous. *United States v. Walton*, 908 F.2d 1289, 1300-01 (6th Cir. 1990).

The Sixth Circuit has "affirmed district courts' drug-quantity determinations that used ascertainable methodologies to arrive at a conservative estimate of drugs." *United States v. Histed*, 93 F.4th 948, 955 (6th Cir. 2024). One such approved methodology is to determine the likely quantity of drugs distributed by, or otherwise attributable to, a defendant within a particular time period, and then to apply that quantity over the total relevant time period. *See, e.g. United States v. Tisdale*, 980 F.3d 1089, 1096-1097 (6th Cir. 2020) (upholding district court's "reasonable estimate" that attributed hundreds of kilograms of drug quantity to defendants over several years, where law enforcement had information that defendants moved 0.5 to 1 pound of marijuana per

7

day).  A court can also convert seized funds into their equivalent amounts of controlled substances for purposes of estimating additional drug amounts that had been previously distributed.  *See, e.g.*, *Murillo-Almarez*, 602 F. App'x at 311 (upholding district court estimate of heroin quantity obtained by dividing total money recovered by the typical street price of heroin); *see also United States v. Russell*, 595 F.3d 633, 647 (6th Cir. 2010); *United States v. Berry*, 90 F.3d 148, 152-153 (6th Cir. 1996).

## III. ANALYSIS

At the September 25, 2025 hearing, Witness-1 testified about extensive drug dealing run by Boseman at his residence on Tebo Street, including the quantities of drugs being distributed from Boseman's residence and Boseman's knowledge and control over that drug distribution.  ECF No. 135.  The Government urges the court to accept Witness-1's testimony almost in full, while seeming to acknowledge some of the ambiguities in his testimony by arguing in favor of a "conservative" estimate of his testimony.  Defendant argues that Witness-1's testimony lacked any trustworthiness, and the court should

disregard in its entirety. The court disagrees with both parties and takes an approach somewhere between the two.

### A. Calculation of Drug Weight

First, the court considers Witness-1's credibility. The court did not find Witness-1 to be particularly credible. While Defendant overstates the extent to which he was not credible (for example, the court does not find it probative that Witness-1 could not remember his home address during the relevant time period), Witness-1's answers to relevant questions changed over the course of his testimony. For example, Witness-1 claimed not to know that the house on Tebo street was raided in August 2021, but then shortly afterward stated that he stopped going to the house because "[i]t had got raided." ECF No. 135, PageID.865. And he later indicated that he was present at the home when the police came knocking at the door in August 2021. *Id.* at PageID.885. He also had motive to lie or to exaggerate; he has signed a cooperation agreement in hopes of receiving a benefit in regard to his own criminal matters. That motive, combined with his at times shifting testimony, indicated some unreliability.

9

However, Witness-1 was not wholly incredible.  The inconsistency of how often he was at the house, and his unwillingness to admit complicity in certain criminal acts, does not negate the preponderance of the evidence showing that he was at the house semi-regularly, selling and buying cocaine.  As to his apparent untruthfulness at earlier stages of the investigation, Witness-1 is related to Boseman and it is not incredible for them to know each other, for Witness-1 to avoid discussing Boseman at particular times, for Witness-1 to lie about Boseman under questioning in his state homicide investigation, or for Witness-1 to seem to avoid admitting fault as to other criminal acts or other potential crimes.  The court found Witness-1 to be credible on several relevant, limited points at issue in these objections: that he visited Boseman's house to buy and sell crack cocaine the summer of 2021, that he did so with some regularity,[1] and that he sold, on average, approximately half an ounce of crack cocaine each occasion he was

---

[1] That Witness-1 was at Boseman's house with some regularity was also corroborated by testimony before the grand jury.  A second witness (Witness-2) identified Witness-1 as being at the house and that Boseman directed his activities.  ECF No. 142-2, PageID.1027-28; *see also* ECF No. 146.  Out of an abundance of caution, the court clarifies that ECF No. 141 applies to the exhibit filed separately at ECF No. 146; ECF No. 146 contains grand jury, private, sensitive, identifying, and/or potentially identifying information regarding witnesses and/or individuals not charged in this matter and shall remain sealed until further order of the court.

there.[2] The only specific point that the court found not to be credible was that Witness-1 was there five days per week during June and July 2021.

On that point, Witness-1 was inconsistent. The Government states that "Witness-1 sold crack cocaine from Boseman's home on a regular basis through the date of Boseman's arrest in August 2021. On average, Witness-1 sold crack cocaine from Boseman's house around five days out of the week during this period." ECF No. 139, PageID.923 (citing ECF No. 135, PageID.853-854). But later, Witness-1's testimony seemed to contradict his earlier statement that he was at the house five days a week. When asked "how many nights" between June and July he was at the house, he said, "A couple nights." ECF No. 135, PageID.896. When asked how often he was there at six o'clock in the morning, he repeated that he was there a "[c]ouple nights." *Id.* When asked how many times he was there at "noon, daylight," his answer was again, a "[c]ouple." *Id.* His answers to questions about being at the

---

[2] Witness-1 testified that he personally sold half an ounce of crack cocaine a day at Boseman's residence. ECF No. 135, PageID.858. Witness-1 typically sold this crack cocaine to users as "10s" (0.1 grams for $10) or "20s" (0.2 grams for $20). *Id.*

11

house at particular times of day did not perfectly counter his prior testimony that he was at the house five days a week, but surely if Witness-1 was actually at the house five days a week from June to early August 2021, he would have been at the house more than a "couple" of times in that period during the day at noon, or more than a "couple" of times at night. Further, on direct examination he stated that when he was at the house "all day some days, some days half the day." ECF No. 135, PageID.860. But on cross he was asked to verify that he saw $10 or $20 bags being sold during the "two hours a day that you were there, sometimes four hours a day and sometimes you weren't there at all, correct?" Witness-1's response was: "Correct." ECF No. 135, PageID.897. Defense counsel's question is not testimony, but the witness' answer did not contradict him that rather than being there "all day" or "half the day," he was usually there only "two hours" to "four hours" a day when he was present. The Sixth Circuit has cautioned that the district court should err "on the side of caution in making its estimate." *See United States v. Sandridge*, 385 F.3d 1032, 1037 (6th Cir. 2004). The court thus does not credit that Witness-1 was at the house five days a week, but nor is a reasonable estimate to say he was

12

there only four occasions (two nights and two days) across two months; defense counsel's questions asked about specific times of day, not 24-hour periods in general. Witness-1's testimony, although inconsistent in the details, repeatedly indicated he was there on more than a weekly basis. Defense counsel's questions also tended to show that Witness-1 may have only been at the house for 2-4 hours at a time, making it likely that the witness could have come by the house at times that defense counsel's questions did not address. The court finds that a reasonable, cautionary estimate of the amount of times that Witness-1 was at the house is two days per week across the relevant time period.

The court finds by the preponderance of the evidence that Witness-1's testimony and Boseman's plea agreement establish with sufficient credibility that: 1) Witness-1 was familiar with Boseman's house on Tebo street, 2) Witness-1 regularly went to Boseman's house to buy or sell drugs, on average at least twice a week between June 1, 2021 to August 2, 2021, 3) that on each of these occasions, Witness-1 sold an average of half an ounce of crack cocaine, and 4) that Boseman aided, abetted, or directed his conduct at Boseman's residence and/or

13

Witness-1's conduct was part of a jointly undertaken criminal activity with Boseman.

Therefore, the court attributes the following drug weight to Witness-1's own sales at the Tebo Street house, which are also attributable to Boseman as part of the relevant conduct of Boseman's offenses of conviction.

**T1: Drug Weight Attributable to Witness-1**

| Category | Methodology | Calculation Result |
|---|---|---|
| Duration of Witness-1's drug distribution at Boseman's residence | June 1, 2021 – August 3, 2021 | 63 days |
| Frequency of Witness-1's drug distribution | Two days per week (63 days x 2 days/7 days) | 18 days |
| Quantity of Witness-1's drug distribution | Half an ounce (14 grams) per day of distribution of crack cocaine (18 days x 14 grams/day) | 252 grams of crack cocaine |
| Converted drug weight amount | 1 gram of crack cocaine = 3,571 grams of CDW | 899.89 kg of CDW |

Witness-1 further testified that Boseman and two other individuals (Individual-1 and Individual-2) also sold crack cocaine at the residence, with Boseman selling the most drugs, and Witness1,

14

Individual-1, and Individual-2 taking turns amongst themselves. Witness-1 estimated that Boseman sold approximately half an ounce to one ounce of crack cocaine a day, and Individual-1 and Individual-2 each also sold approximately half an ounce of crack cocaine a day. Witness-1 also testified that he sometimes bought powder cocaine from Boseman, although the frequency that he did so was unclear. ECF No. 135, PageID.857. The court similarly does not credit the 5-days per week estimate, but otherwise finds the testimony credible as to there being at least one other person selling crack cocaine at the house on regular occasions, whether that was Boseman himself, Individual-1, or Individual-2, that this other person sold half an ounce a day of crack cocaine, and this person sold crack cocaine at least the same number of days that Witness-1 was present at the residence. Using the same estimate of two days per week, that yields the same calculation for sales attributable to Boseman or other individuals under Boseman's direction.

T2: Drug Weight Attributable to Boseman's Other Sales

| Category | Methodology | Calculation Result |
|---|---|---|
| Duration of Witness-1's drug distribution | June 1, 2021 – August 3, 2021 | 63 days |

| | | |
|---|---|---|
| at Boseman's residence | | |
| Frequency of Boseman's drug distribution witnessed by Witness-1 | Two days per week (63 days x 2 days/7 days) | 18 days |
| Quantity of Witness-1's drug distribution | Half an ounce (14 grams) per day of distribution of crack cocaine (18 days x 14 grams/day) | 252 grams of crack cocaine |
| Converted drug weight amount | 1 gram of crack cocaine = 3,571 grams of CDW | 899.89 kg of CDW |

In addition, the drugs seized from Boseman's residence total an additional 40 kg of CDW. Defendant did not object to the inclusion of this amount.

Finally, cash amounts may be converted to their drug equivalents as part of the drug quantity estimate. The PSR establishes that Boseman was not employed at the time of the offense, had limited employment history aside from a short employment period in 2019, and no other specific sources of income that were not connected to his maintenance of the drug premises. Police seized $602.54 cash on Boseman's person and $1,130.00 in a safe in February 2021, and an additional $741 in cash on his person on August 3, 2021. It is likely

16

that the cash possessed by Boseman in 2021, amounting to a total of $2,476.54, came from either the sale of powder cocaine to other drug dealers at his residence, or the sale of crack cocaine to drug customers at his residence.  Witness-1 testified that he purchased powder cocaine from Boseman at the rate of $1,400 per ounce, and that the rate for the sale of crack cocaine to drug customers was $10 per one-tenth of a gram, which correlates to $2,800 per ounce.  Taking the more cautious estimate that Boseman's cash came from the sale of powder cocaine, which results in lower guidelines than a conversion of the cash amounts into crack cocaine quantities, the total cash quantity of $2,476.54 would correspond to approximately 1.7 ounces, or 49.5 grams, of powder cocaine.  This corresponds to 9.9 kilograms of CDW, at the rate of 200 grams of CDW per gram of powder cocaine.  *See* U.S.S.G. §2D1.1 n.8(D).  The drug equivalents for cash seized from Boseman's residence total an additional 9.9 kg of CDW.

      In all, this totals 1,849.68 kg of CDW.

B.  **Calculation of Boseman's Guidelines**

The combined amount of 1849.68 kg of CDW arising from Boseman's drug sales or sales attributable to him corresponds to a base offense level of 30. U.S.S.G. §2D1.1(c)(5).

The Probation Department scored additional Chapter 2 enhancements under § 2D1.1. for possession of a dangerous weapon (+2), use of violence (+2), and maintaining a drug premises (+2), as well as a Chapter 3 enhancement for Boseman's position as an organizer, leader, manager, or supervisor (+2), and a reduction for his acceptance of responsibility (-3). ECF No. 124, PageID.753-754. Boseman did not object to these enhancements. Boseman also did not object to the Probation Department's calculation of a criminal history category of IV. *See id.*, PageID.759.

Thus, Boseman's final offense level is 35, resulting in guidelines of 235-293 months.

**SO ORDERED**.

Date: December 12, 2025                s/F. Kay Behm
                                       F. Kay Behm
                                       United States District Judge

18